7 F.3d 1552
 Sandra POST, Abilio Lirio, Plaintiffs-Appellees,
v.
CITY OF FORT LAUDERDALE, Defendant,
Doug Danziger, City Commissioner, John Schlegel, Boris
Sellers-Sampson, Roy Hurley, William Helms,
William Banks, Sr., Defendants-Appellants,
Patrick Roberts, Phil Krauss, Defendants.
 No. 92-4661.
 United States Court of Appeals,
Eleventh Circuit.
 Nov. 9, 1993.
 
 Robert H. Schwartz, Ft. Lauderdale, FL, for defendants-appellants.
 Louis C. Thomas, Herzfeld and Rubin, Miami, FL, for plaintiffs-appellees.
 Appeal from the United States District Court for the Southern District of Florida.
 Before EDMONDSON and CARNES, Circuit Judges, and HILL, Senior Circuit Judge.
 EDMONDSON, Circuit Judge:
 
 
 1
 This case involves claims brought under 42 U.S.C. § 1983. The district court denied defendants' motion for summary judgment based on qualified immunity. We reverse.
 
 I. Background
 
 2
 Sandra Post is the former owner of Big Louie's restaurant in the City of Fort Lauderdale ("the City").[1] Abilio Lirio is the former manager. On February 10, 1988, Post decorated Big Louie's with a large campaign balloon supporting a candidate opposed to Doug Danziger, the incumbent City Commissioner.
 
 
 3
 On February 17, Danziger sent a memo to the City Manager requesting a review of parking at Big Louie's. A City code team visited Big Louie's on February 19.[2] The code team said nothing about parking, but left behind a notice of violation citing the restaurant for exceeding its maximum occupancy cap ("max cap") of 22.
 
 
 4
 On February 26, the City Manager gave Danziger a memo describing the February 19 inspection. In reply, Danziger sent the City Manager a memo discussing "the Big Louie's problem" and requesting a review of "parking requirements for this type of operation." A copy of the City Manager's memo also went to John Schlegel, the Assistant Director of the Building and Zoning Department. Because Schlegel's supervisor had written "code team" on the memo, Schlegel asked the code team to visit the restaurant.
 
 
 5
 On February 28, a code team composed of Roy Hurley, a building inspector, Boris Sellers-Sampson, a police officer, and William Banks, a fire inspector, visited Big Louie's. Hurley counted 50 customers, Sellers-Sampson counted 43, and Banks counted 44. After discussing his results with Banks, Sellers-Sampson issued Lirio a notice to appear for violating the max cap.[3] The notice said 43 people were present. Lirio signed the notice without telling the code team he thought the counts were wrong.
 
 
 6
 The same code team visited again on March 4. After doing a head count, Sellers-Sampson issued another notice to appear, which said that 33 people were present. Banks also counted heads and filled out a fire inspection report noting that 31 people were seated.
 
 
 7
 Danziger was reelected as City Commissioner on March 15. On March 18, the code team returned. Banks completed an inspection report noting that 27 people were seated and 6 were standing. Post signed the report without disputing the code team's head counts. Sellers-Sampson also counted 27 people. After comparing his results with Banks, he arrested Post for violating the building code. When Post protested, he added the charge of interfering with an officer. He also arrested Lirio for obstructing an officer and resisting arrest.
 
 
 8
 Post and Lirio sued Danziger, Schlegel, Sellers-Sampson, Hurley, and Banks, among others, under 42 U.S.C. § 1983. Defendants moved for summary judgment based on qualified immunity. The district court granted summary judgment to defendants on all but the following claims: 1) retaliatory prosecution of Lirio against Sellers-Sampson, Hurley, and Danziger; 2) false arrest of Post against Sellers-Sampson and Hurley; 3) false arrest of Lirio against Sellers-Sampson; 4) excessive force used against Lirio by Sellers-Sampson and Hurley; 5) deprivation of Post's due process rights against all defendants; and 6) failure to supervise against Schlegel and Danziger. Defendants appeal.
 
 
 9
 To oppose summary judgment, plaintiffs offered evidence[4] that Schlegel was overheard discussing plans to "hit" Big Louie's before the arrests. Schlegel also said, referring to plaintiffs, "we are going to teach those fucking ass holes [sic] a lesson."
 
 
 10
 Big Louie's hostess said in an affidavit that the restaurant had 19 or 20 customers during the March 4 visit and that the restaurant was below the max cap during the February 28 visit. Lirio testified that he thought Big Louie's had 19 customers during the February 28 visit, 19 or 20 during the March 4 visit, and 18 or 19 during the March 18 visit. He added he only signed the February 28 report because Sellers-Sampson "got a little nasty" and ordered him to sign. Post likewise claimed that a code team member made her sign the March 18 report.
 
 
 11
 Bystanders said that Lirio was doing nothing to interfere with the code team when he was arrested. Lirio testified he did tell an employee to turn down the radio after Post was arrested. Sellers-Sampson then told Lirio to be quiet; Lirio repeated his instruction to turn the radio down. Sellers-Sampson told Lirio he was under arrest. Lirio then put his hands up (Lirio says to be handcuffed). Sellers-Sampson told Lirio to stop resisting arrest, spun him around, placed him against a display case, applied a choke hold, and handcuffed him.
 
 
 12
 Afterwards, Sellers-Sampson took Lirio outside. When Lirio made a remark, Sellers-Sampson told Lirio, "shut up, you're under the control of the hatchet man for the commissioner now." When Lirio kept speaking, Sellers-Sampson pushed Lirio against a wall.
 
 
 13
 The interference charge against Post was eventually dropped, and Post and Lirio were acquitted on the remaining charges. Before Lirio was tried, two City prosecutors said or implied they would drop the charges against Lirio if he signed a civil liability release.
 
 II. Discussion
 
 14
 Defendants argue they are entitled to summary judgment based on qualified immunity. We review this issue de novo. Hutton v. Strickland, 919 F.2d 1531, 1536 (11th Cir.1990).
 
 
 15
 Qualified immunity protects government officials performing discretionary functions from civil liability if their conduct violates no "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Suits against government officials for damages against them individually are costly not only for the defendants, but for society as a whole. The social costs include "the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office." Id. at 814, 102 S.Ct. at 2736. Qualified immunity recognizes that, "where an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken 'with independence and without fear of consequences.' " Id. at 819, 102 S.Ct. at 2739 (citations omitted).
 
 
 16
 The public's strong interest in avoiding government disruption requires that qualified immunity be an immunity from trial, not just from liability. See Green v. Brantley, 941 F.2d 1146, 1149 (11th Cir.1991); Siegert v. Gilley, 500 U.S. 226, ----, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991) (one purpose of qualified immunity "is to spare a defendant ... unwarranted demands customarily imposed upon those defending a ... lawsuit"). The erroneous denial of qualified immunity on summary judgment significantly undercuts the purposes behind qualified immunity and is harmful even if the defendants, in their individual capacities, ultimately prevail at trial.
 
 
 17
 To show the law is clearly established, a plaintiff cannot rely on "general, conclusory allegations" or "broad legal truisms." Barts v. Joyner, 865 F.2d 1187, 1190 (11th Cir.1989); see Adams v. St. Lucie County Sheriff's Dep't, 962 F.2d 1563, 1574-75 (11th Cir.1992) (Edmondson, J., dissenting), approved en banc, 998 F.2d 923 (11th Cir.1993); Muhammad v. Wainwright, 839 F.2d 1422, 1424 (11th Cir.1987). Instead, the burden is on the plaintiff to show that, when the defendant acted, the law established the contours of a right so clearly that a reasonable official would have understood his acts were unlawful. See Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).
 
 
 18
 The line between lawful and unlawful conduct is often vague. Harlow 's "clearly established" standard demands that a bright line be crossed. The line is not found in abstractions--to act reasonably, to act with probable cause, and so on--but in studying how these abstractions have been applied in concrete circumstances. If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant. See Dartland v. Metropolitan Dade County, 866 F.2d 1321, 1323 (11th Cir.1989) (discussing qualified immunity and the First Amendment).
 
 
 19
 Qualified immunity is a question of law for the courts, even when asserted on summary judgment. See Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985). When we review denials of summary judgment based on qualified immunity, our inquiry is limited to deciding if the facts, viewed in the plaintiff's favor, show a genuine dispute on facts material to the qualified immunity analysis. See Daniel v. Taylor, 808 F.2d 1401, 1402 (11th Cir.1986); Clark v. Evans, 840 F.2d 876, 881 & n. 6 (11th Cir.1988). The plaintiff opposing summary judgment has the burden of showing that a genuine dispute on a material fact exists. See Hutton, 919 F.2d at 1536. Conclusory allegations or evidence setting forth legal conclusions are insufficient to meet the plaintiff's burden. See Bennett v. Parker, 898 F.2d 1530, 1534 (11th Cir.1990); Condos v. Conforte, 596 F.Supp. 197, 199 (D.Nev.1984).
 
 
 20
 The objective nature of qualified immunity defines what fact issues are material for summary judgment purposes. To avoid summary judgment it is not enough for a plaintiff to produce evidence, which--if believed (for summary judgment its truth is assumed)--would allow a fact-finder to find just that the government-agent defendant was, in reality, wrong about the facts on which the defendant acted. Instead, to defeat summary judgment because of a dispute of material fact, a plaintiff facing qualified immunity must produce evidence that would allow a fact-finder to find that no reasonable person in the defendant's position could have thought the facts were such that they justified defendant's acts. See Sims v. Metropolitan Dade County, 972 F.2d 1230, 1234-35 (11th Cir.1992) (illustrating what kinds of fact issues are material to qualified immunity).
 
 A. Retaliatory Prosecution of Lirio
 
 21
 Count One alleged that Sellers-Sampson, Danziger, and Hurley had Lirio prosecuted on the obstruction and resistance charges to deter Lirio from filing a civil action against the City. No evidence showed that Sellers-Sampson, Hurley, or Danziger had anything to do with the decision whether or not to prosecute Lirio. Defendants are, at least, entitled to qualified immunity because no facts before us show defendants violated clearly established law. See Lindsey v. Storey, 936 F.2d 554, 563 (11th Cir.1991) (where no evidence showed defendant caused detention, summary judgment was proper); Barts, 865 F.2d at 1195-96 (police were not liable for trial, conviction, and incarceration because prosecutor broke chain of causation after allegedly false arrest).
 
 B. False Arrest of Post
 
 22
 Count Two alleged that Sellers-Sampson arrested Post without probable cause. Probable cause exists if "the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Von Stein v. Brescher, 904 F.2d 572, 578 (11th Cir.1990). When an officer asserts qualified immunity, the issue is not whether probable cause existed in fact, but whether the officer had "arguable" probable cause to arrest. Moore v. Gwinnett County, 967 F.2d 1495, 1497 (11th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1049, 122 L.Ed.2d 357 (1993). That is, the officer is entitled to qualified immunity if a reasonable officer "could have believed that probable cause existed." Id.
 
 
 23
 Here, the issue is not whether the code team's head counts were, in fact, correct; on summary judgment, we assume that plaintiffs' evidence about the number of customers is true. The issue material to qualified immunity is whether a reasonable officer in Sellers-Sampson's place--that is, in these circumstances--could have believed that more than 22 customers were present during a code team visit.[5]
 
 
 24
 When Sellers-Sampson arrested Post, he knew the code team had found max cap violations on three earlier visits. He himself had counted more than 22 people on the February 28 and March 4 visits and had verified his results with another code team member. On March 18, the night of the arrests, both he and Banks counted over 22 people.
 
 
 25
 The code team's head counts might have been wrong; but from the record before us, no reasonable fact-finder could find other than that a reasonable officer in Sellers-Sampson's place could have thought Big Louie's was over the max cap. Plaintiffs admit that at least 18 or 19 customers were present each time the code team visited and that the number might have been 20 on the night of the arrests. The difference between 20 customers and more than 22 is small; in many circumstances, a reasonable officer could believe that more than 22 customers were present, even if the actual number was 20.
 
 
 26
 A mistaken but reasonable count cannot be ruled out in this case given the conditions at Big Louie's. The undisputed evidence showed the aisles were crowded when the code team visited Big Louie's. The code team had to count customers while ignoring employees and keeping track of customers that were entering, exiting, and waiting for take-out food. Under the circumstances, a reasonable officer in Sellers-Sampson's place could have believed that more than 22 customers were present, even if the actual number was a little lower, as plaintiffs claim. Sellers-Sampson is entitled to qualified immunity because he had arguable probable cause to arrest Post.[6]
 
 
 27
 Plaintiffs alleged that Hurley was liable for participating in Post's false arrest. In addition to what has already been said about the head counts, Hurley had no authority to arrest Post and knew nothing about the arrests before they took place. Although Hurley counted heads on February 28 and March 18, no evidence shows that Sellers-Sampson talked to Hurley about arresting Post. Hurley is entitled to qualified immunity because Hurley's acts, as established by the record before us, violated no clearly established law.
 
 C. False Arrest of Lirio
 
 28
 Count Three alleged that Sellers-Sampson arrested Lirio without probable cause. As we understand Florida law, it is a crime not only to oppose or to obstruct a law officer in the execution of the officer's duty, but also to attempt to oppose or to obstruct the officer. And none of these crimes require violence or the offer to do violence. See Fl.Stat. § 843.02[7]; State v. Tousignant, 460 So.2d 450, 451 (Fla.Dist.Ct.App.1984). Defendants argue Sellers-Sampson is entitled to qualified immunity because he had arguable probable cause (whether or not probable cause existed in fact) to believe Lirio had committed or was about to commit a crime.
 
 
 29
 Defendants claim that, after Post was arrested, Lirio began "inciting" bystanders and threatening Sellers-Sampson. Plaintiffs deny these allegations, but concede that Lirio did keep talking after Sellers-Sampson told him to be quiet.[8] The undisputed evidence showed that the restaurant was crowded and that customers were stopping to watch Post's arrest. Sellers-Sampson had also been told earlier by another police officer that Lirio had recently resisted arrest with violence.[9] Under these circumstances, a reasonable officer in Sellers-Sampson's place could have believed Lirio's repeated comment in seeming defiance of a police instruction indicated that Lirio was interfering or about to attempt to interfere with the code team. Sellers-Sampson is entitled to qualified immunity because he had arguable probable cause to arrest Lirio. Put differently, Lirio has not shown that the law of probable cause is so clearly established that no reasonable officer, faced with the situation before Sellers-Sampson, could have believed that probable cause to arrest existed.
 
 
 30
 Plaintiffs also concede that Lirio--without having been told to do so--raised his hands to Sellers-Sampson after being told he was under arrest. Because a reasonable officer in Sellers-Sampson's place could have interpreted this raising of hands as resistance, Sellers-Sampson is entitled to qualified immunity.
 
 D. Excessive Force against Lirio
 
 31
 Count Four alleged that Sellers-Sampson used excessive force when he arrested Lirio. Whether a specific use of force is excessive turns on factors such as the severity of the crime, whether the suspect poses an immediate threat, and whether the suspect is resisting or fleeing. See Graham v. Connor, 490 U.S. 386, 394, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989). Use of force must be judged on a case-by-case basis "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. Because this standard establishes no bright line, qualified immunity applies unless application of the standard would inevitably lead every reasonable officer in Sellers-Sampson's position to conclude the force was unlawful.
 
 
 32
 Before the night of the arrests, another officer told Sellers-Sampson that he had recently arrested Lirio for resisting arrest and that Lirio's resistance had been violent. Plaintiffs admit that Lirio was in a choke hold for about "five seconds" and that he sought no medical treatment until almost three years after the arrest. When Lirio raised his hands, a reasonable officer in Sellers-Sampson's place could have concluded that the technique Sellers-Sampson used was needed to stop Lirio from becoming violent.
 
 
 33
 Once Lirio was handcuffed and taken outside, no further force was needed. But, even though pushing Lirio against the wall might have been unnecessary, this pushing was not plainly unlawful. When Sellers-Sampson acted, the case law on excessive force looked to, among other things, the need for force, the amount of force used, and the injury inflicted. See Leslie v. Ingram, 786 F.2d 1533, 1536 (11th Cir.1986). That the amount of force Sellers-Sampson used, even if unnecessary, was enough to violate the law was not plain; reasonable doubt existed, and still exists, on whether this amount of unnecessary force was unlawful. See, e.g., Ingraham v. Wright, 430 U.S. 651, 675, 97 S.Ct. 1401, 1415, 51 L.Ed.2d 711 (1977) (de minimis rule applies to excessive force claims asserted under Eighth Amendment); Norris v. District of Columbia, 737 F.2d 1148, 1152 (D.C.Cir.1984) (de minimis rule applies to excessive force claims asserted under due process clause); Johnson v. Glick, 481 F.2d 1028, 1033 (2nd Cir.1973) ("Not every push or shove ... violates a prisoner's constitutional rights."); Hudson v. McMillian, --- U.S. ----, ----, 112 S.Ct. 995, 1000, 117 L.Ed.2d 156 (1992) (Eighth Amendment "necessarily excludes from constitutional recognition de minimis uses of physical force"). Sellers-Sampson is entitled to qualified immunity because it was not clearly established that the amount of force he used outside the restaurant was unlawful.
 
 
 34
 Plaintiffs alleged that Hurley was also liable on this count because he failed to stop Sellers-Sampson from using excessive force. A police officer has a duty to intervene when another officer uses excessive force. See Fundiller v. City of Cooper City, 777 F.2d 1436, 1441-42 (11th Cir.1985). But Hurley is a building inspector, not a police officer. As plaintiffs conceded at oral argument, no case clearly establishes that civilians have a duty to intervene. Hurley is thus entitled to qualified immunity.
 
 E. Violation of Post's Due Process Rights
 
 35
 Count Five alleged that Danziger, Schlegel, Banks, Hurley, and Sellers-Sampson violated Post's procedural due process rights. Plaintiffs claim that defendants tried to "harass, oppress and wholly ruin" Post by having her arrested and prosecuted.
 
 
 36
 Plaintiffs rely on Espanola Way Corp. v. Meyerson, 690 F.2d 827 (11th Cir.1982). In Espanola, city officials were alleged to have formed and expressly ordered a task force to harass local hotels to drive the hotels out of business. Noting the sparse factual record (the district court proceedings took place before Harlow was decided) and that defendants did not actually assert qualified immunity (although in a memorandum to the district court defendants did assert their good faith), we decided the officials were not due summary judgment for losses that resulted when the task force issued over 300 plainly unwarranted building and fire code violations to one hotel.
 
 
 37
 We have a different record in this case. The code team's acts were not plainly unwarranted. From what plaintiffs have said, a code team could have reasonably believed that the max cap notices were justified. And, someone like Sellers-Sampson could have reasonably believed he could arrest Post because Big Louie's was still over the max cap after having received three notices in a row. Plaintiffs claim defendants deliberately used the code team to try to ruin Post. Even if this subjective motivation were true, no facts show the code team's objective conduct in inspecting for violations, issuing citations, or making arrests was plainly unjustified. Cf. United States v. Edenfield, 995 F.2d 197 (11th Cir.1993) (whether police violated due process turns on evidence of "outrageous misconduct," not evidence of officer's motive for investigating defendants).
 
 
 38
 Issuing an unreasonably high number of fully warranted citations might violate due process. But, where no bright-line rule determines how many citations are too many, we are "extremely wary" of denying qualified immunity unless the number of citations "falls well outside" the range of lawful conduct. Lindsey, 936 F.2d at 559 (discussing whether length of seizure was long enough to violate clearly established law). Defendants are entitled to qualified immunity because no case clearly establishes that issuing three arguably justified citations and then making one arguably justified arrest over a period of about 30 days violates due process.
 
 F. Supervisory Liability
 
 39
 Count Six alleged that Schlegel and Danziger were liable for endorsing or failing to prevent the code team's allegedly unlawful acts. Supervisors can be liable under section 1983 only if they actually participated in the allegedly wrongful act, or if a causal connection exists between their acts and the alleged violation. See, e.g., Fundiller, 777 F.2d at 1443.
 
 
 40
 Plaintiffs showed no causal connection between Danziger and Schlegel's acts and the code team's allegedly unlawful acts. That Schlegel discussed plans to "hit" Big Louie's and that Sellers-Sampson called himself Danziger's "hatchet man" have support in plaintiffs' evidence. These supposed facts do not support the inference that Schlegel and Danziger directed the code team to act unlawfully or that they knew the code team would act unlawfully and failed to stop it. At most, the facts show that Schlegel and Danziger disliked plaintiffs and might have influenced the code team to look for violations of the law; plaintiffs neither allege nor show that Schlegel and Danziger allowed other restaurants to break the law without consequences. Schlegel and Danziger are, at least, entitled to qualified immunity because their conduct--sending a code team to check if a restaurant was violating the building code--violated no clearly established law.
 
 III. Conclusion
 
 41
 Because defendants are entitled to qualified immunity on all counts, we REVERSE the denials of summary judgment to defendants in their individual capacities and REMAND for further proceedings.
 
 
 
 [1]
 The facts that follow are essentially undisputed
 
 
 [2]
 A code team is a multi-agency City force designed to combat health, safety, and building code violations. A typical code team includes a police officer, a zoning department employee, and a fire department employee
 
 
 [3]
 A notice of violation gives written notice that an inspector has found a code violation. A notice to appear is a summons that takes the place of a physical arrest. Only police officers can issue notices to appear
 
 
 [4]
 Defendants dispute plaintiffs' evidence on the facts that follow
 
 
 [5]
 Building code violations are misdemeanors under local law. South Fl. Building Code §§ 3101.5, 205. City police officers can make warrantless arrests for misdemeanors or for violations of local law committed in the officer's presence. Fla.Stat. § 901.15; Municipal Ordinance 1-6.1
 
 
 [6]
 Plaintiffs alleged that Sellers-Sampson acted "intentionally, willfully, [and] maliciously" in arresting Post. This allegation, which might be read to allege that Sellers-Sampson actually believed he had no probable cause, has no effect on our qualified immunity analysis. Qualified immunity invokes an objective standard; that is, if a reasonable person in the defendant's place could have acted the same way, the defendant's subjective intent is irrelevant. See Harlow, 457 U.S. at 816, 102 S.Ct. at 2737 (because "substantial costs attend the litigation of the subjective good faith of government officials," subjective malice is irrelevant to qualified immunity)
 
 
 [7]
 Section 843.02 says in part:
 Whoever shall resist, obstruct, or oppose any officer ... without offering or doing violence to the person of the officer, shall be guilty of a misdemeanor....
 
 
 [8]
 On summary judgment, we accept plaintiffs' version of what happened as true. But the issue again is not whether Lirio did, in fact, commit acts of obstruction and resistance or even, in fact, attempt to do so; the issue material to qualified immunity is whether a reasonable officer in Sellers-Sampson's place could have thought the facts were such that he could reasonably conclude that Lirio was committing, or was about to attempt, acts of obstruction or resistance
 
 
 [9]
 See generally Beck v. State of Ohio, 379 U.S. 89, 95, 85 S.Ct. 223, 228, 13 L.Ed.2d 142 (1964); State v. Caicedo, 622 So.2d 149, 150 (Fla.Dist.Ct.App.1993) (police officer's knowledge of earlier arrests relevant to determination of probable cause)