**Genevieve FERNANDEZ, as Personal Representative of the Estate of Fidel Fernandez, for the benefit of the estate, and Genevieve Fernandez, individually as surviving mother, Plaintiff,**

v.

**CITY OF COOPER CITY, a municipal corporation, et al., Defendants.**

No. 01–7059–CIV.

United States District Court, S.D. Florida.

May 10, 2002.

**1372**

Orlando J. Buch, Esq., Stephen A. Black, Esq., Counsel for Plaintiff.

Richard H. McDuff, Esq., Scott D. Alexander, Esq., Johnson Anselmo Murdoch Burke & George, P.A., Fort Lauderdale, Counsel for Defendants.

## ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

MIDDLEBROOKS, District Judge.

THIS CAUSE comes before the Court upon two motions for summary judgment, one filed by the municipal defendant, City of Cooper City (DE# 42), and one filed by the three individual police officers named as defendants in the Third Amended Complaint (DE# 44). Both motions were filed on February 28, 2002. On April 3, 2002, the plaintiff submitted her response to these motions, with the defendants submitting their respective replies on April 10, 2002. Accordingly, the issue has been fully briefed and is ripe for disposition. The Court has reviewed the record, the submissions of counsel, the relevant caselaw, and is otherwise fully advised in the premises. Further, the Court took oral argument on these motions in West Palm Beach, Florida, on May 10, 2002. Based on the following discussion, the Court finds that all defendants are entitled to summary judgment in their favor.

### I. *Legal Standard*

Summary judgment is appropriate when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party bears the burden of meeting this rather rigorous standard. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). In analyzing a motion for summary judgment, the evidence, as well as all reasonable factual inferences drawn therefrom, must be viewed in the light most favorable to the nonmoving party—here, the plaintiff. *See Arrington v. Cobb County,* 139 F.3d 865, 871 (11th Cir. 1998); *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir.1997).

Equally apparent, however, is the principle that the nonmoving party bears the burden of coming forward with evidence of each essential element of the relevant claims, such that a reasonable jury could find in his or her favor. *See Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1080 (11th Cir.1990). The nonmoving party "[m]ay not rest upon the mere allegations and denials of [its] pleadings, but [its] response ... must set· forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also LaChance v. Duffy's Draft House, Inc.,* 146 F.3d 832, 835 (11th Cir.1998) ("Summary judgment may be granted if the evidence is 'merely colorable.' ") (quoting *Anderson,* 477 U.S. at 248). It is from this point that the Court begins its analysis.

### II. *Facts*

Viewing the evidence in the light most favorable to the plaintiff, the Court recites the following version of the events at issue. The plaintiff relies primarily on the deposition testimony of Carlos "José" Perez in describing what occurred, and given the summary judgment standard, the Court will as well, filling in the gaps with other undisputed evidence where necessary.

Fidel Fernández ("Fidel"), a 48–year–old Hispanic male, was approximately 6′ 4″ tall, and weighed around 225 pounds. He was a Vietnam veteran and suffered from chronic paranoid schizophrenia. Although

there is much testimony concerning Fidel's mental condition and the Winn Dixie employees' (and other employees in the same shopping center) knowledge of this, there is no evidence that any of the police officers who were involved in this situation had any similar knowledge about Fidel.

Fidel often accompanied his mother (now deceased) to the Winn Dixie supermarket in question, located in the City of Cooper City. Fidel was a heavy smoker, and was often seen smoking cigarettes in the parking lot in front of the Winn Dixie. On the morning of June 26, 2000, a Cooper City 911 emergency dispatcher received a call concerning a "man in the parking lot just loitering [in the Winn Dixie parking lot], smoking cigarettes, talking to himself, sitting in the middle of the road." The caller described the man as "wearing green shorts and a green shirt," and stated that the man "looks like he's been drinking for a while or he's just normally that way . . . . ." At approximately 8:45 a.m., the dispatcher relayed this information to Officer Michael Doddo, one of the individual defendants here, who proceeded to the Winn Dixie. Officer Chris Bushing, another of the individual defendants, also advised that he would report to the scene. Officer Bushing arrived first. Upon arrival, Officer Doddo positioned his police vehicle so that his in-car video camera could capture the events. Both parties have submitted this videotape in connection with the instant motion.

Several witnesses testified that when Officer Bushing first arrived on the scene, Fidel was sitting in the driver's seat of his mother's automobile, smoking a cigarette, with the window rolled down. Many of these witnesses also stated that as Officer Bushing approached the car in which Fidel was sitting, Fidel flicked a burning cigarette at Officer Bushing, hitting him in the chest area. However, viewing the evidence in the light most favorable to the plaintiff, the Court shall relay and credit the description of the events as told by Carlos "José" Perez, a then–77–year–old Winn Dixie employee. According to Mr. Perez, when Officer Bushing arrived, dressed in full uniform, Fidel was sitting on the ground on an island in the parking lot, smoking a cigarette. Officer Bushing walked—at a normal pace and with his arms to his side—toward Fidel, approaching him from the back, and asked Fidel to stand up. At this time, Officer Bushing had not touched Fidel. Officer Bushing then grabbed Fidel by the arm, and Fidel stood up. Officer Bushing has been described as being slight of build, tall and strong, but several inches shorter and many pounds lighter than Fidel.[1] Mr. Perez testified that he was too far away to hear what was then being said, but stated that Officer Bushing then attempted to place handcuffs on Fidel. At this point, by all accounts, Fidel began physically resisting the officers.[2] Fidel was flailing his

---

1. "He was shorter, a lot lighter than [Fidel] Fernandez." Saez depo. at 19:19.

2. Concerning this resistance, the witness upon who the plaintiff principally replies, Mr. Perez, testified as follows: "They wanted to put handcuffs on him but he didn't let them, but between the three of them they forced him," Perez depo. at 15:04–05. When asked whether Fidel "tr[ied] to resist the police officer," Mr. Perez answered, "Yes, of course," id. at 15:20–22, and that "the boy was defending himself." Id. at 19:19. When asked if

Fidel was "swinging his arms," Mr. Perez stated, "Yes. The policeman couldn't manage him," id. at 22:19–20, that the policeman "couldn't control him," id. at 23:11, and that Officer Bushing attempted to put handcuffs on Fidel—"That's what he wanted to do, but he couldn't." Id. at 23:17. Mr. Perez opined that "[i]f the other two police officers hadn't arrived, they wouldn't have been able to throw [Fidel] to the ground," id. at 25:02–02, and that Fidel fought with Officer Bushing for approximately ten minutes. See id. at 25:05–22.

arms about with closed fists. At some point, Officers Doddo and Robert Polink also arrived on the scene.

The videotape introduced by both sides shows the view of the scene from Officer Doddo's police cruiser. It is unclear at what point in the narrative the videotape picks up. However, what the video does show is Fidel swinging his arms in large circular motions, striking one of the officers and knocking the officer's sunglasses off of his head. Fidel also strenuously resists the officers' attempts to subdue him by pushing at least one officer away with his arms and taking off across the parking lot in a headlong run. From this point, the video camera's vantage point was not able to record the remainder of what transpired.

However, the testimony of the other witnesses to the event establishes that the three officers immediately gave chase, catching up with Fidel within several yards of where the encounter began. "When [the officers] surrounded [Fidel], he continued to try and lash out and hit at the different cops that were over there." Burton depo. at 19:23–25. The three officers managed to wrestle Fidel to the ground, where Fidel continued to actively resist the attempts to restrain him. According to Mariano Nodel, a Winn Dixie supervisor, Fidel was face-down on the ground, "and [the officers] were trying to keep him on the floor from moving, and ... he was struggling to get out, starting to move up, starting to move up or whatever, and they were just trying to hold him down." Nodel depo. at 12:03–07. Fidel was "moving like his shoulder trying to—you know, trying to get out." *Id.* at 13:12–13. All of the witnesses testified that at no point did any of the officers punch, kick, or hit Fidel with their hands, feet, or other objects, such as their nightsticks, firearms, or flashlights. Likewise, no officer drew his weapon during the occurrence.

The officers managed to place two sets of handcuffs on Fidel's hands and plastic restrainer cuffs on his legs. The cuffs were placed on Fidel's legs because he was kicking. The three officers worked in concert to hold Fidel to the ground while the restraining cuffs were placed on him. One of the officers had a knee pressed against Fidel's back. Although no witness testified to seeing this, according to the police reports, Officer Doddo at one point sprayed Fidel's face and upper body with one stream of Freeze +P Pepper Spray. Shortly after the officers had managed to place the cuffs on Fidel's hands and legs, Fidel stopped moving. The officers checked for a pulse and, able to find none, called for the paramedics. The officers removed the restraints from Fidel's hands and legs and began CPR. However, they were unable to revive Fidel, who died at approximately 9:30 a.m.

## III. *Discussion*

### A. The Individual Officers

On June 22, 2001, Fidel's mother, Genevieve Fernandez, filed the instant suit as personal representative of Fidel's estate as well as on her own behalf. After going through various amendments, the Third Amended Complaint, the current operative complaint, alleges the use excessive force against the individual defendants and inadequate training against the municipal defendant, both claims brought under 42 U.S.C. § 1983, and wrongful death under Florida state law. Discovery has now closed in the case, and the defendants have moved for summary judgment on all counts. The individual officers have asserted the defense of qualified immunity.

The doctrine of qualified immunity "protects government officials performing discretionary functions from civil liability if their conduct violates no 'clearly established statutory or constitutional rights of

which a reasonable person would have known.'" *Post v. City of Fort Lauderdale,* 7 F.3d 1552, 1556 (11th Cir.1993) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).[3] "Qualified immunity is a question of law for the courts, even when asserted on summary judgment." *Id.* at 1557. The first inquiry which a court must make is whether the government official(s)—here, the individual officers—were performing discretionary functions. *See Courson v. McMillian,* 939 F.2d 1479, 1487 (11th Cir. 1991). Neither side addresses this issue in any depth whatsoever, and the Court itself concludes that the officers were inherently performing a discretionary function when they were called to the Winn Dixie parking lot that morning. *Cf. Lee v. Ferraro,* 284 F.3d 1188, 1194 (11th Cir.2002) ("In this case, there can be no doubt that [the officer] was acting in his discretionary capacity when he arrested [the plaintiff].").

The Court must next "determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all," *Conn v. Gabbert,* 526 U.S. 286, 290, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999), and, if this query is answered in the affirmative, only then "proceed to determine whether that right was clearly established at the time of the alleged violation." *Id.*

"In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force," because " § 1983 'is not' itself a source of substantive rights,' but

merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor,* 490 U.S. 386, 393–94, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (quoting *Baker v. McCollan,* 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)). Here, the sole constitutional violation alleged against the individual officers is that for the use of excessive force in violation of the Fourth Amendment. Therefore, the Court must determine whether these defendants violated this constitutional right and, if so, whether that right was clearly established as of June 26, 2000.

The Eleventh Circuit has very recently spoken on this issue. In *Lee v. Ferraro,* 284 F.3d 1188 (11th Cir.2002), the appellate court set forth the following framework this Court finds extremely useful in guiding the instant analysis:

.... In order to determine whether the amount of force used by a police officer was proper, a court must ask "whether a reasonable officer would believe that this level of force is necessary in the situation at hand." *Willingham [v. Loughnan]* 261 F.3d [1178,] 1186 [ (11th Cir.2001) ]. The Supreme Court has held that "[d]etermining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham,* 490 U.S. at 396 ... (quoting

---

**3.** In *Post,* the Eleventh Circuit described the policy rationale behind qualified immunity as follows:

Suits against government officials for damages against them individually are costly not only for the defendants, but for society as a whole. The social costs include "the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from accep-

tance of public office." [*Harlow,* 457 U.S.] at 814 .... Qualified immunity recognizes that, "where an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken 'with independence and without fear of consequences.'" *Id.* at 819 ....

7 F.3d at 1556.

*Tennessee v. Garner*, 471 U.S. 1, 8, 105 S.Ct. 1694, 85 L.Ed.2d 1 ... (1985) (internal quotations omitted)).....

The Supreme Court has established that, in order to balance the necessity of using some force attendant to an arrest against arrestee's constitutional rights, a court must evaluate a number of factors, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*..... *Graham* dictates unambiguously that the force used by a police officer in carrying out an arrest must be reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer, and the risk of flight.

*Id.* at 1197–98; *see also Crosby v. Paulk*, 187 F.3d 1339, 1351 (11th Cir.1999) ("The proper standard for evaluating such a Fourth Amendment, excessive force claim is whether, under the circumstances confronting the officers and disregarding their intent or motivation, their conduct was objectively reasonable."). It is of paramount importance that a reviewing court judge consider the use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and refrain from slipping into the role of Monday-morning quarterback, for "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is

necessary in a particular situation." *Graham*, 490 U.S. at 396–97. Finally, in light of the extremely fact-intensive nature of the excessive-force inquiry, it has often been noted that "this standard establishes no bright line." *Post*, 7 F.3d at 1559.

■ After reviewing the facts in the light most favorable to the plaintiff, the Court finds that the officers did not utilize unconstitutionally excessive force. The Court bases this decision on an analysis of these facts as applied to the *Graham* factors of severity of the crime, the threat to officers and others, and Fidel's headlong flight from the officers. First, as to the severity of the crime, assuming that Fidel did not flick a lit cigarette at Officer Bushing, which would be battery upon a law enforcement officer, a third-degree felony in the State of Florida, *see* Fla. Stat. §§ 784.07(2)(b), 843.01, there is still no right to resist as Fidel did. Under Mr. Perez's version of the facts, Fidel was sitting on the ground of an island in the parking lot when Officer Bushing approached him from the rear. The Court must consider the facts from the perspective of a reasonable officer in Officer Bushing's position; that is, as an officer who had received a report from the 911 dispatcher concerning a man sitting in the Winn Dixie parking lot, talking to himself, and appearing to the caller either to have been drinking or to be mentally unstable.[4] Officer Bushing asked Fidel to stand up and, when Fidel did not comply, Officer Bushing grabbed Fidel by the arm. Officer Bushing attempted to cuff Fidel, and by the accounts of every witness, Fidel then began physically to resist. Fidel was

---

**4.** Again, although there is a considerable amount of evidence concerning what knowledge people who worked at the Winn Dixie or in the same shopping center had about Fidel's mental condition, this does not logically factor into a consideration of the reasonableness or otherwise of the *officers' actions*. That a

Winn Dixie checkout clerk or Radio Shack employee would have reacted differently to the situation based on his or her knowledge of Fidel's condition does not indicate that the officers' response—wholly uninformed by such familiarity with Fidel—was objectively unreasonable.

several inches and many pounds heavier than Officer Bushing.

■ A recent Florida decision has reiterated the proposition that "the use of force in resisting an arrest by a person reasonably known to be a law enforcement officer is unlawful notwithstanding the technical illegality of the arrest." *Tillman v. State,* 807 So.2d 106, 108–09 (Fla. 5th DCA 2002) (quoting *State v. Barnard,* 405 So.2d 210 (Fla. 5th DCA 1981)); *see also State v. Giddens,* 633 So.2d 503, 503 (Fla. 5th DCA 1994). The *Tillman* court predicated this conclusion on Fla. Stat. § 776.051(1), which makes clear that "[a] person is not justified in the use of force to resist an arrest by a law enforcement officer who is known, or reasonably appears, to be a law enforcement officer." According to Mr. Perez, Officer Bushing arrived in "a black car" and was "dressed in a uniform ... with black sunglasses on ...." Perez depo. at 12:22–25. The videotape also shows all officers as being dressed in full uniform. Accordingly, at the very least, Officer Bushing "reasonably appear[ed] to be a law enforcement officer," Fla. Stat. § 776.051(1), and Fidel was not justified in physically resisting as he did. Physically resisting a law enforcement officer acting in his or her line of duty may be neither armed robbery nor jaywalking, but the Court finds in these circumstances that it was closer to the former than the latter. Therefore, the severity of the crime element of the *Graham* inquiry highlights the non-excessive nature of the force the officers used in restraining Fidel.

■ The second *Graham* element is the perceived threat to the officers and to others. There are many facts which could easily lead reasonable officers in the position in which these defendants found themselves to conclude that Fidel posed a threat to them, to others in the area, and perhaps to himself. First, from what the officers knew, Fidel's mental condition was ambiguous at best—the caller had reported Fidel as possibly under the influence of alcohol (which could reasonably be considered to include other drugs), or mentally unstable. Either scenario presents a heightened possibility of threat to the officers and others. Second, Fidel did in fact violently resist the officers. All witnesses testified to this, and the dashboard videotape shows Fidel swinging his arms wildly and striking at least one officer. His struggles knocked the sunglasses off of one officer. According to Mr. Perez, Officer Bushing did not appear able to control the physically larger Fidel, and could not have done so had the other officers not arrived on the scene. Additionally, Fidel continued thrashing about once taken to the ground. He would not submit to the officers' attempts at restraining him, and given his physical size, it took the efforts of all three officers and a blast of pepper spray to ensure that Fidel could not continue kicking, swinging his arms, and attempting to flee from the authorities. Clearly, reasonable officers in this position could perceive Fidel as a significant threat to themselves and to others.

The final *Graham* factor—flight—also supports the amount of force used in restraining Fidel. Again, there is no factual dispute that after resisting Officer Bushing's attempts to restrain him and flailing his arms about wildly, striking at least one officer, Fidel took off in a headlong run across the parking lot. In *Goodman v. Town of Golden Beach,* 988 F.Supp. 1450 (S.D.Fla.1997), an individual whom the police were attempting to question on one occasion ran from the police onto his own property and on another occasion drove away from the police when they tried to stop him for a traffic violation. *See id.* at 1453. Assessing this individual's subsequent excessive force claim against the police officers, Judge Gold concluded that

"[t]he use of force during the attempted arrests ... was not clearly unlawful ... [in part because] [f]aced with a fleeing, uncooperative suspect, these officers could reasonably have thought the use of force was necessary." *Id.* at 1456–57.[5] *Goodman*'s reasoning is instructive, and the circumstances in the case at bar demonstrate an even greater rationale than in that case as to why flight justified the use of force. Rather than submit to the officers' questioning and attempts at restraining him, Fidel resisted, struck the officers and took off running. This very scenario is what the courts have in mind when assessing whether an officer's use of force was objectively reasonable. One simply cannot strike an officer, take off running, and not expect to be physically subdued by the police.

■ The plaintiff's primary argument appears to be that the "positional asphyxiation" of Fidel evidences the fact that the officers used unconstitutionally excessive force in restraining Fidel. Plaintiff's

medical expert described the factors contributing to positional asphyxiation as prone restraint, pressure on the upper torso, handcuffing, struggle, and obesity. In their answers to plaintiff's interrogatories, the officers admit to being familiar with the term "positional asphyxiation." However, it is unclear as to what reasonable alternatives the officers had in dealing with Fidel. The prone restraint, pressure on the upper torso (presumably from one of the officer's knees being pressed to Fidel's back), handcuffing, and struggle were *all* the result of Fidel's illegal, physical, and prolonged resistance. It was of course an unfortunate occurrence, but sympathy for a plaintiff does not transform law enforcement officials' objectively reasonable responses to a volatile situation into a constitutional violation.[6]

In their moving papers and at oral argument, the defendants rely in large part on *Cottrell v. Caldwell*, 85 F.3d 1480 (11th Cir.1996). This case does support the defendants' arguments here. In *Cottrell*, two

---

5. Plaintiff relies on *Jackson v. City of Albany, Ga.*, 49 F.Supp.2d 1374 (M.D.Ga.1998), where the court denied the officer-defendants' motion for summary judgment based on an assertion of qualified immunity, to support the argument that the officers used excessive force. However, *Jackson* is plainly distinguishable from this case. There, the officers approached a man matching a suspect's description that they had been given. The man fled, the police pushed him down, and the man got up and continued fleeing. The police caught up with him and, in the course of being restrained, the man died of asphyxiation due to neck compression. *See id.* at 1376. In applying the *Graham* factors and denying the officers' motion based on qualified immunity, the court noted (1) that there was little to no evidence that this suspect had committed any crime at all; (2) that the suspect's flight mitigated any potential threat to the officers; and (3) that the flight alone could not establish the reasonableness of the officers' actions. *See id.* at 1377. However, in the case at bar, the officers knew that Fidel *did* commit a crime, and one of violence,

when he physically resisted Officer Bushing's attempts at restraining him and flailed his arms about, striking at least one officer. Additionally, with these actions as a backdrop, there was no reasonable assurance whatsoever that Fidel's flight lessened the threat to the officers and to others, as Fidel had already showed himself to be physically aggressive. Therefore, *Jackson* does not support the plaintiff's arguments.

6. *Apropos* of this observation, the Eleventh Circuit has recently stated,

> Given the [serious nature of § 1983 plaintiff's injury], we are presented with the proverbial "hard case," that is, one in which one's natural sympathies are aroused by the plaintiff's plight. We recall Justice Jackson's warning to judges: "We agree that this is a hard case, but we cannot agree that it should be allowed to make bad law." *FCC v. WOKO, Inc.*, 329 U.S. 223, 229, 67 S.Ct. 213, 91 L.Ed. 204 ... (1946).

*Rodriguez v. Farrell*, 280 F.3d 1341, 1351 n. 19 (11th Cir.2002).

police officers were dispatched to a house in response to a 911 emergency call. Upon arrival, the decedent's grandmother informed the officers that her grandson had a history of psychological problems and that he had stopped taking his medication. *See id.* at 1488. After "an incident occurred inside the residence," the two officers attempted to arrest the decedent. *Id.* A physical struggle ensued, and two other officers were called for backup. The four officers struggled with the decedent for a period of twenty minutes, after which they were able to place handcuffs and leg restraints on the decedent. *See id.* The officers placed the decedent in the backseat of one of the cruisers, in a position in which the decedent was unable to inhale sufficient oxygen. As a result, the decedent died of positional asphyxiation. On these facts, the district court denied the officers' motion for summary judgment based on qualified immunity, and the Eleventh Circuit tersely reversed. The appellate court found that "[t]he district court's detailed factfindings concerning the events surrounding the arrest and the force applied *make it clear* that there is no genuine issue of material fact concerning excessive force in this case, and the defendant officers are entitled to summary judgment as a matter of law." *Id.* at 1492 (emphasis added). In the case at bar, three officers physically struggled with Fidel, a noncooperative individual, for a period much shorter than twenty minutes, managed to wrestle him to and keep him on the ground, and placed handcuffs and leg restraints on him. If it was "clear" in *Cottrell* that there was no unconstitutionally excessive force, a comparison and contrast of the cases' respective facts leads to the conclusion that the same result obtains here.

In conclusion, when considering the evidence in the light most favorable to the plaintiff, as well as from the perspective of a reasonable law enforcement officer faced with that situation, the application all of the *Graham* factors demonstrate the objective reasonableness of the officers' actions.[7] The officers never drew their weapons, never punched or kicked Fidel, and never struck him with their nightsticks or flashlights. They sprayed Fidel with one blast of pepper stray, took him to the ground, one officer placed a knee to Fidel's back in order to keep him from struggling free, and they placed cuffs on his hands and legs. The sum total of these actions was an objectively reasonable response to the situation with which these officers were confronted. Therefore, as a matter of law, the plaintiff has failed to show a violation of a constitutional right, and all the individual officers are protected by qualified immunity. The Court shall accordingly grant their motion for summary judgment.

### B. The Municipal Defendant, City of Cooper City

The Third Amended Complaint contains one count against the City of Cooper City (the "City") for inadequate training, brought under 42 U.S.C. § 1983, and one count for wrongful death under Fla. Stat. § 768.28. The City is entitled to summary judgment on both counts.

In *City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), the Supreme Court held that "while claims ... alleging that the city's failure to provide training to municipal employees resulted in [a] constitutional deprivation ... are cognizable under § 1983, they can

---

7. The plaintiff also asserts that some officers violated their duty to intervene. It is true that "[a] police officer has a duty to intervene when another officer uses excessive force." *Post,* 7 F.3d at 1560 (citing *Fundiller v. City of Cooper City,* 777 F.2d 1436, 1441–42 (11th Cir.1985)). However, this claim fails with the conclusion that no officer used excessive force in this situation.

only yield liability against a municipality where that city' failure to train reflects deliberate indifference to the constitutional rights of its inhabitants." *Id.* at 392. The Supreme Court assumed for purposes of that decision that the individual's constitutional right had been violated. *See id.* at 388 n. 8. In the case at bar, however, based on the conclusion that the individual officers committed no Fourth Amendment violation by utilizing excessive force in restraining Fidel, the City of Cooper City cannot be held liable under the plaintiff's claims of inadequate training. *See City of Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) (per curiam) (holding that the municipal defendants "were sued only because they were thought legally responsible for [the individual officer's] actions; if the latter inflicted no constitutional injury on respondent, it is inconceivable that [the municipal defendants] could be liable to respondent."); *Wyke v. Polk County Sch. Bd.,* 129 F.3d 560, 569 (11th Cir.1997) ("Before addressing whether the School Board can be held liable for a failure to train its employees, we must first determine whether those employees violated any of [plaintiff's] constitutional rights ...."); *Rooney v. Watson,* 101 F.3d 1378, 1381 (11th Cir.1996) ("Since we have determined that Deputy Watson's conduct did not cause the [plaintiffs] to suffer a constitutional deprivation, we need not inquire into [the municipal defendant's] policy and custom relating to patrol vehicle operation and training."); *see also Goodman,* 988 F.Supp. at 1460 ("A claim of inadequate training and supervision under section 1983 cannot be made out against a supervisory body without a finding of constitutional violation by the persons supervised."). In short, here, there has been no "constitutional deprivation" upon which the Supreme Court's *City of Canton* decision was predicated. Therefore, there can be no inadequate-training liability on the part of the City, and it is entitled to summary judgment on that count.

■ The complaint also charges the City with wrongful death, under Fla. Stat. § 768.28. The City argues that this claim is defeated by application of Fla. Stat. § 776.085, which states:

(1) It shall be a defense to any action for damages for ... wrongful death, ... that such action arose from injury sustained by a participant during the commission of a forcible felony. The defense authorized by this section shall be established ... by proof of the commission of such crime or attempted crime by a preponderance of the evidence.

(2) For the purposes of this section, the term "forcible felony" shall have the same meaning as in s. 776.08.

*Id.* The cross-referenced section, in turn, provides that " '[f]orcible felony' means ... any ... felony which involves the use or threat of physical force or violence against any individual." *Id.* § 776.08. Here, based on the undisputed evidence, and therefore inherently established at least by a preponderance of the evidence, it is clear that at some point after Officer Bushing attempted to restrain him, Fidel swung his arms about and struck at least one of the uniformed officers. This was a battery. *See id.* § 784.03.[8] Under Florida law, a battery committed against a law enforcement officer in this manner is a third-degree felony, *see id.* § 784.07(2)(b),[9]

---

8. In Florida, battery is defined as occurring when a person "[a]ctually and intentionally touches or strikes another person against the will of the other." Fla. Stat. § 784.03.

9. This statutory section states that a person who knowingly commits a battery upon, among others, a law enforcement officer, while the officer is "engaged in the lawful performance of his or her duties," is guilty of a third-degree felony, rather than a battery's normal first-degree misdemeanor classification.

and in this case obviously involved "the use ... of physical force or violence ...." *Id.* § 776.08. Resisting arrest with violence is also a third-degree felony, *see, e.g., Wardell v. State,* 631 So.2d 1130, 1131 (Fla. 5th DCA 1994) (per curiam), and it has been noted that "engaging in a scuffle with an officer during an improper detention constitutes battery upon a law enforcement officer and can itself give rise to a valid arrest and conviction for the offense of resisting arrest with violence." *Miller v. State,* 636 So.2d 144, 151 (Fla. 1st DCA 1994) (per curiam) (citing *Reed v. State,* 606 So.2d 1246 (Fla. 5th DCA 1992) and *Savage v. State,* 494 So.2d 274 (Fla. 2d DCA 1986)). The plaintiff's argument against this is that Fidel did not commit a "forcible felony." The testimony of all witnesses—including Mr. Perez—indicates that Fidel did in fact commit a forcible felony when he physically resisted the officers' attempts to restrain him. The videotape evidence supports this conclusion even more fully. Accordingly, the City may avail itself of the statutory defense to the damages claim for wrongful death. Based on the undisputed evidence in this case, viewed in the light most favorable to the plaintiff, the City is entitled to summary judgment on the Florida wrongful death claim.

## IV. *Conclusion*

Therefore, based upon the above discussion, the Court finds that all defendants are entitled to summary judgment. Accordingly, it is hereby

ORDERED AND ADJUDGED that the City of Cooper City's Motion for Summary Judgment (DE# 42) is GRANTED. Further, the three individual police officers' Motion for Summary Judgment (DE# 44) is also GRANTED. Final Judgment shall be entered separately.