[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
May 11, 2004
THOMAS K. KAHN
CLERK

_____

No. 03-13331

_____

D. C. Docket No. 99-03393-CV-AJ

MISTY KINGSLAND,

Plaintiff-Appellant,

versus

CITY OF MIAMI,
a Florida Municipal Corporation,
RAMON DE ARMAS,
individually,
E. VALENZUELA,
individually,
J. BALIKES,
individually,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(May 11, 2004)**

Before WILSON and KRAVITCH, Circuit Judges, and GOLDBERG*, Judge.

WILSON, Circuit Judge:

Appellant Misty Kingsland appeals the district court's grant of summary judgment in favor of Defendants-Appellees, based on her § 1983 claims of false arrest and malicious prosecution.[1]  For the reasons that follow, we reverse the district court's judgment and remand this case for further proceedings consistent with this opinion.

## I.  BACKGROUND

*A.  Factual Background*

At approximately 8:00 p.m. on November 27, 1995, Appellant Kingsland was involved in an automobile accident with off-duty Officer Ramon De Armas of the City of Miami Police Department.  Officer De Armas reported the accident on his police radio.  Kingsland, who was driving a yellow Penske rental truck, had two passengers with her.  De Armas was transporting one passenger in his unmarked police vehicle.  Kingsland asserts that De Armas ran a red light and

---

* Honorable Richard W. Goldberg, Judge, United States Court of International Trade, sitting by designation.

[1] Kingsland does not appeal summary judgment as to her claims against the City of Miami, but only as to her claims against the defendant officers.

2

caused the accident, while De Armas avers that it was Kingsland who ran the red light.

At the time of the accident, Kingsland was not under the influence of alcohol or drugs. As a result of the accident, Kingsland suffered head trauma, cried, was dizzy, felt sick, and had blurred vision. Following the collision, she climbed out of the rental truck and sat down in a pile of shattered glass adjacent to the truck, cutting her hand. She was disoriented and was "in and out of it." Not knowing Officer De Armas had been a participant in the collision, and instead believing him to be an officer who had responded to the scene, Kingsland screamed to him, "He just ran the red light and hit me!"

Although Miami police officers promptly responded to the scene of the accident, an officer did not approach Kingsland until approximately thirty minutes had passed. At that time, Kingsland remained seated in a pile of shattered glass and was unable to stand up. When asked for her license and registration, she attempted to stand to retrieve it, but had to sit back down. One of her passengers eventually obtained the license and registration from the truck.

Kingsland alleges that she told the officers that she was dizzy and could not stand up. She also mentioned that she had sustained injuries to her head, and

3

requested ice for her head, which she did not receive.[2]  Contrary to the assertions

of the defendants, Kingsland contends that she was not treated at the scene by

emergency medical technicians.  Officer De Armas and his passenger, however,

did receive medical treatment.

Despite the presence of about twenty police officers at the scene, no officer

asked Kingsland for a statement of her version of the events or spoke to any

witnesses on the scene.  However, the officers spent a great deal of time talking to

Officer De Armas, who claimed that Kingsland was at fault.

When Officer Valenzuela arrived at the scene, Officer Balikes told Officer

Valenzuela that he noticed an odor of cannabis coming from Kingsland's vehicle

and person, and that he thought Kingsland was impaired.  Officer Valenzuela then

went to the truck to corroborate Officer Balikes's statements, and later testified

that he also smelled a "slight odor" of cannabis on Kingsland's person.  Yet, none

of these investigating officers saw fit to conduct a search of Kingsland's vehicle.

Likewise, no drug-sniffing dogs were summoned to corroborate the officers'

beliefs, and no cannabis was ever found.  Kingsland denies the existence of any

---

[2] A post-accident physical exam conducted by Kingsland's doctor revealed that Kingsland bore two black eyes; a bruise and a large bump on her head; bruising from her left shoulder across her chest (presumably from her seatbelt); and injuries to her left jaw, hip, and shoulder due to impact with the inside of the truck.

cannabis or cannabis odor on her person or in the truck. In her complaint, she alleges that the officers fabricated the smell of cannabis in an effort to manufacture probable cause.

Officer Valenzuela also noticed that Kingsland's eyes were bloodshot. Kingsland explains that if her eyes were bloodshot, it was because she had been crying. Officer Valenzuela saw one of Kingsland's passengers being treated by rescue personnel, but did not attempt to talk to him or the other passenger to assess whether either of them smelled of cannabis.

Officer Balikes and another officer asked Officer Valenzuela, who is a certified Driving Under the Influence (DUI) technician with two years experience, to administer a field sobriety test on Kingsland. Kingsland informed the officers that she was feeling dizzy and sick, and that she wanted to go to the hospital.[3] The officers did not talk to rescue personnel about Kingsland's condition.

During the "walk and turn" test, Kingsland did an about face instead of doing the turn as instructed. She also swayed while balancing on one leg, did not properly place her finger to her nose, missed the tip of her nose five times, failed to follow instructions, had eyelid tremors, and failed to keep her eyes shut during

---

[3] In contrast, Officer Valenzuela testified that Kingsland did not say she was dizzy, and that she responded that she was fine when asked if she was okay.

5

the Rhomberg balancing test. Officer Valenzuela concluded that Kingsland failed the sobriety tests.

The officers then escorted Kingsland into a police cruiser, informing her that she was being transported to the hospital for treatment and more tests.[4] She was instead taken into custody and brought to a DUI testing facility. At the police station, the defendants and other officers accused her of running a red light and causing the accident.

Although Officer Valenzuela says that he always suspected that Kingsland was under the influence of cannabis and later charged her with that offense, Kingsland stated that she was charged with driving under the influence of alcohol upon arriving at the station. Kingsland asserts that the officers told her they knew she was drunk and had been driving drunk. They performed between two and four Breathalyzer tests, all of which came back negative–with a 0.000% alcohol content. When the Breathalyzer results came back, the officer who was writing on a form asked another officer what he should then write. The second officer told the first officer to write that Kingsland had a strong odor of cannabis emitting

---

[4] Kingsland's passengers were left at the scene of the accident.

from her breath. At that point, the first officer threw away the form he was writing on and started writing on a new form.[5]

After she passed the Breathalyzer tests, Kingsland continued telling the officers that she did not do drugs and that she felt sick. Officer Valenzuela then requested that a drug test be performed on Kingsland. Officer Robert Jenkins of the Miami Beach Police Department responded and performed more tests on Kingsland, including walking a straight line, touching her nose, and closing her eyes while extending her arms. Officer Jenkins determined that Kingsland's normal facilities were impaired and obtained a urine specimen from her.

Kingsland was then handcuffed, transported to the Dade County jail, and charged with DUI.[6] Her father posted a $1,000.00 bond the following day, and she was subsequently arraigned on charges of careless driving, reckless driving, and

---

[5] The arrest affidavit, which was signed by Officer Balikes, states that Kingsland "ran the red light . . . and collided with a [sic] unmarked police unit," and that she was "observed with bloodshot eyes, slurred speech, and a strong odor of cannabis emitting from her breath." Although the arrest affidavit was completed after the Breathalyzer tests had been administered, the affidavit contains no mention of the negative Breathalyzer results. Instead, in the area in which the officer was to mark whether the arrestee was under the influence of alcohol, a box was checked to indicate that the answer was unknown.
    Kingsland denies that there was any odor of cannabis on her person or in the truck. Further, she disputes without supporting evidence whether she had bloodshot eyes and slurred speech, and claims that if she did in fact exhibit these characteristics, they resulted from the trauma of the accident and her subsequent continual crying.

[6] While incarcerated, Kingsland's eyes began dilating and constricting, and she began vomiting. The prison nurse mentioned that she was afraid Kingsland may have suffered a concussion, placed Kingsland in isolation, and checked on her every fifteen to thirty minutes.

DUI. Kingsland made two trips from New Jersey to Florida to appear in court on these charges.

The defendant officers assert that they never received the laboratory test results, which came back negative for cannabis. They claim that, according to police department policies, drug test results are delivered to the prosecutor and the officer who submits the sample for analysis–in this case, Officer Jenkins.[7]

On February 5, 1996, the prosecutor provided the negative urine test results to Kingsland's counsel. In May 1996, after two court appearances that resulted in continuances, Kingsland filed a motion to dismiss in light of the drug test results. The charges were dropped on June 6, 1996.

B. Procedural History

Kingsland filed suit under 42 U.S.C. § 1983 against Officers De Armas, Balikes, and Valenzuela, and against the City of Miami, alleging false arrest and malicious prosecution. In *Kingsland v. City of Miami*, No. 99-03393-CV-AJ (S.D. Fla. May 29, 2003), the district court granted summary judgment in favor of the defendants, finding that the officers had probable cause to arrest Kingsland, and that the officers were entitled to qualified immunity on both claims.

------

[7] Because Officer Jenkins worked for the Miami Beach police, the City of Miami police department did not receive the test results, despite the fact that the case arose in the City of Miami.

8

Kingsland appeals the district court's grant of summary judgment, arguing that the appellees violated her Fourth Amendment rights and are not entitled to qualified immunity.

## II. STANDARD OF REVIEW

We review a district court's grant of summary judgment *de novo*, applying the same legal standards used by the district court. *See O'Ferrell v. United States*, 253 F.3d 1257, 1265 (11th Cir. 2001). Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). We view the evidence and all factual inferences therefrom in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-movant. *See Burton v. City of Belle Glade*, 178 F.3d 1175, 1187 (11th Cir. 1999) (citing *Clemons v. Dougherty County*, 684 F.2d 1365, 1368-69 (11th Cir. 1982)).

## III. DISCUSSION

*A. False Arrest*

A warrantless arrest without probable cause violates the Constitution and provides a basis for a section 1983 claim. *Marx v. Gumbinner*, 905 F.2d 1503, 1505 (11th Cir. 1990). The existence of probable cause at the time of arrest,

however, constitutes an absolute bar to a section 1983 action for false arrest. *Id.* at 1505-06. Because this case comes to us on summary judgment, we need only decide whether the defendants carried their burden of demonstrating that probable cause existed to arrest Kingsland as a matter of law.

Probable cause to arrest exists when an arrest is objectively reasonable based on the totality of the circumstances. *Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir. 1998). "This standard is met when 'the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Id.* (quoting *Williamson v. Mills*, 65 F.3d 155, 158 (11th Cir. 1995)).

### 1. The Integrity of the Evidence

If the officers' assessment that Kingsland's eyes were bloodshot, that her speech was slurred, and that either she or her truck smelled of cannabis were undisputed, we would have no problem agreeing with the district court's conclusions. The record, however, contains evidence that contradicts each of these findings, sufficient to overcome summary judgment.

Principally, the defendant officers based their arrest in part on their allegation that they detected an odor of cannabis emanating from either

10

Kingsland's breath, her person, or her vehicle. However, Kingsland claims that she did not engage in illegal drug activity on the day of the accident or on any other day, and hence, that the officers could not have detected any such odor prior to her arrest. At the outset, the district court erred in failing to recognize in Kingsland's complaint the assertion that the defendants fabricated evidence to support probable cause.

We find it significant that Kingsland is able to support her assertions of fabrication with the following facts: (1) despite detecting an odor of cannabis, the officers chose not to conduct a search of Kingsland's vehicle or her passengers to corroborate their testimony; (2) the officers did not call in drug-sniffing dogs to confirm their suspicions of drug use; (3) no drugs were ever found or produced; (4) Kingsland tested negative for cannabis; (5) Kingsland's vehicle was not impounded as evidence, nor was her allegedly odoriferous clothing retained; (6) the defendants stated in their arrest affidavit that Kingsland ran the red light, allegedly without taking statements from available witnesses or from Kingsland herself; and (7) the officers decided to charge Kingsland with DUI-cannabis rather than DUI-alcohol, and simultaneously destroy an initial arrest affidavit, only after

she passed Breathalyzer tests.[8]  In sum, the defendants appear to lack any

corroborating evidence to support their testimony that an odor of cannabis was

present, whereas Kingsland is able to support her assertions with circumstantial

evidence.

In finding both probable cause and reasonable suspicion to conduct a field

sobriety test on Kingsland, the district court stated:

> Officers Valenzuela and Balikes detected an odor of cannabis
> emanating from [Kingsland's] truck.  Ms. Kingsland denied that *she*
> smelled of cannabis, but she has no evidence to contradict the
> testimony of Officers Valenzuela and Balikes about the truck's odor.
>     . . . .
> Even though Ms. Kingsland did not smell of cannabis – I credit
> her version of events instead of Officer Valenzuela's and Officer
> Balikes' – she has no evidence to contradict the testimony of Officers
> Valenzuela and Balikes that there was an odor of cannabis from the
> truck.

*Kingsland*, No. 99-03393-CV-AJ, slip op. at 6, 9.  We have several concerns about

this reasoning.

First, the record contains conflicting accounts regarding where the odor of

cannabis originated.  On the arrest affidavit, Officer Balikes stated that Kingsland

---

[8] In contrast, we are mindful that a court need not entertain conclusory and
unsubstantiated allegations of fabrication of evidence.  *See, e.g., Cunningham v. Gates*, 229 F.3d
1271, 1291-92 (9th Cir. 2000) (dismissing plaintiffs' conclusory allegations of fabrication where
the plaintiffs produced "not an iota of evidence" to suggest that the defendant officers fabricated
evidence).

12

"was observed with . . . a strong odor of cannibis [sic] emitting from her breath."

However, the arrest affidavit makes no mention of a cannabis odor emanating

from the truck. Moreover, Officer Valenzuela, a DUI specialist, testified that he

has trouble smelling cannabis on a person's breath, and instead indicated that he

detected a "slight odor" of cannabis on Kingsland's person. Thus, there are

genuine issues of fact regarding (1) whether there was any odor at all, and (2) if

there was an odor, whether it radiated from the truck, from Kingsland's person, or

from Kingsland's breath.

Second, we note that the plaintiff has proffered no less evidence regarding

the presence or absence of a cannabis odor than the defendants have. The

plaintiff's word is merely countered by the defendants' testimony. Given the

standard of review at the summary judgment stage, we must accept Kingsland's

version of the facts as true. *See Rowe v. City of Fort Lauderdale*, 279 F.3d 1271,

1279 n.9 (11th Cir. 2002) (stating that a court must accept the non-movant's

version of disputed facts as true for purposes of summary judgment). Therefore,

the district court improperly accepted as true the defendants' allegation that the

truck smelled of cannabis, and erroneously used this fact to support summary

judgment in the defendants' favor. Whether an odor of cannabis was indeed

13

emanating from the truck is a genuine issue of material fact suitable for consideration by a jury.

Third, the district court incorrectly concluded that Kingsland has no evidence to contradict the officers' testimony regarding the truck's odor. As detailed above, Kingsland *has* presented circumstantial evidence to support her assertion that the truck did not smell of cannabis.

In addition, while laboratory tests have proven that Kingsland was drug-free at the time of her arrest, the defendants have proffered no objective evidence that drugs were present, either on Kingsland's person or in her truck. We find it incredible that the officers failed to conduct a search of Kingsland's vehicle or summon drug-sniffing dogs upon detecting the "strong odor" of a narcotic, the mere possession of which is illegal. *See, e.g., United States v. Reeh*, 780 F.2d 1541, 1543 n.1 (11th Cir. 1986) ("After a member of the [Coast Guard] detected the odor of marijuana, a search ensued during which the marijuana was discovered."). Presumably, if cannabis were present, such evidence would justify a drug possession charge.

Finally, it is unclear why the district court chose to credit Kingsland's testimony that she did not smell of cannabis, and yet chose not to accept her assertions that the truck likewise did not smell of cannabis.

We cannot allow a probable cause determination to stand principally on the unsupported statements of interested officers, when those statements have been challenged and countered by objective evidence.[9]

2. *The Sufficiency of the Investigation*

Next, we consider whether the defendants' investigation was constitutionally deficient. Appellant argues that the district court erroneously concluded as a matter of law that the officers conducted a constitutionally-sufficient investigation, thereby removing the inquiry from a jury. She contends that, objectively, officers should not be permitted to turn a blind eye to exculpatory information that is available to them, and instead support their actions on selected facts they chose to focus upon. We agree.

In *Sevigny v. Dicksey*, 846 F.2d 953 (4th Cir. 1988), the Fourth Circuit stated:

> [A qualified immunity analysis] must charge [the officer] with possession of all the information reasonably discoverable by an officer acting reasonably under the circumstances. . . . "[A] police officer may not close his or her eyes to facts that would help clarify

---

[9] We further note that this is a special case wherein the investigating officers were responding to a call made by a fellow officer on his police radio, to an accident involving that very officer. If ever there were a case in which we should recognize the potential existence of a motive for fabrication, this is it. *Cf. Stone v. City of Chicago*, 738 F.2d 896 (7th Cir. 1984) (finding evidence sufficient to support jury verdict in favor of plaintiffs on conspiracy claim under 42 U.S.C. § 1985 where plaintiffs were involved in collision with officers).

the circumstances of an arrest." *BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986) (officer must be held to knowledge of reasonably discoverable information bearing upon probable cause to arrest for child neglect).

*Sevigny*, 846 F.2d at 957 n.5. Because the officer in *Sevigny* made an arrest without heeding certain, easily obtained information, the Fourth Circuit held that the officer failed to act reasonably. *Id.* at 957. The court articulated that the officer "simply did not bother to do what any police officer acting reasonably in the circumstances would have done to clarify the factual situation" and that "[t]here was no exigency which prevented his doing so." *Id*. at 958. Kingsland asserts that the same situation presents itself here. She maintains that the district court's conclusion that the investigation was sufficient to form a basis for probable cause implies that "no good-faith investigation whatsoever is required to satisfy this standard." Initial Brief of Appellant at 22.

The district court focused on the reasonableness of Kingsland's arrest given what the officers *did* investigate, ignoring the fact that they may have subjectively failed to investigate both sides of the story. On the other hand, Kingsland argues (and *Sevigny* implies) that officers must investigate objectively and consider all information available to them at the time.[10] While the constitutional

---

[10] We are aware that officers are not required to perform error-free investigations or independently investigate every proffered claim of innocence. *See Baker v. McCollan*, 443 U.S.

16

reasonableness of a police investigation does not depend on an officer's subjective intent or ulterior motive in conducting the investigation, s*ee, e.g., Whren v. United States*, 517 U.S. 806, 812-13 (1996), it does not follow that the officer may then investigate selectively. The Fourth Circuit's approach is on point in this case, and would serve to deter dishonest officers from fabricating charges to cover up improper detentions by including only selective evidence in their reports.

We recognize, however, that a police officer "is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997). Nevertheless, an officer may not choose to ignore information that has been offered to him or her, such as Kingsland's assertions that she was injured and that Officer De Armas ran the red light. Nor may the officer conduct an investigation in a biased fashion or elect not to obtain easily discoverable facts, such as whether there was cannabis in the truck or whether witnesses were available to attest to who was at fault in the accident.

---

137, 145-46 (1979). However, that is a separate inquiry than the narrow question presented here. Here, Kingsland alleges that the defendants turned a blind eye to immediately available exculpatory information, improperly choosing to gather information that would exonerate Officer De Armas in a biased manner.

The lack of corroboration through independent police work of De Armas's allegation that Kingsland was at fault in the accident is noteworthy in our probable cause analysis. *Cf. Ortega v. Christian*, 85 F.3d 1521, 1525 (11th Cir. 1996) (finding no probable cause where arresting officer relied on unsubstantiated informant's tip, failed to take any independent steps to investigate the tip, and did not have any evidence which would have corroborated the tip).

Appellees rely on the Seventh Circuit's decision in *Qian v. Kautz*, 168 F.3d 949 (7th Cir. 1999), to support their assertion that they possessed probable cause for Kingsland's arrest. In *Qian*, the court held that a police officer had probable cause to make a DUI arrest where (1) the officer observed that a driver had lost control of his car and crashed, (2) the driver was slumped over and had difficulty walking, (3) the inside of the car showed no signs of a violent impact or that the driver's body had hit anything during the accident, (4) the driver denied being injured and showed no physical signs of injury, (5) the driver's speech seemed slurred, and (6) the officer did not know anything about the driver's preexisting head injury, which caused his impairment. *Id*. at 952-53. The defendants assert that, as in *Qian*, they reasonably relied on their experience in concluding that Kingsland's behavior most likely resulted from drug intoxication. However, *Qian* is distinguishable in a number of significant respects. First, Qian crashed his own

vehicle without apparent reason and so was clearly at fault, whereas the question of fault in Kingsland's collision is unclear and disputed. Second, the responding officer in *Qian* searched the vehicle for signs of injury and for drugs or alcohol before making an arrest, while the defendant officers did neither before arresting Kingsland. Third, the officer in *Qian* asked the driver several times if he was okay, and the driver denied any injury and showed no outward signs of injury. In contrast, Kingsland alleges that, despite her pronouncements of injury and her visible signs of injury, the defendants denied her medical attention and altogether ignored her injuries. Fourth, Qian was not involved in a collision with a police officer, thereby assuaging concerns of concealment and impropriety. Fifth, unlike Kingsland, Qian did not make any allegations of fabrication. Lastly, the plaintiff's injuries in *Qian* were preexisting and did not appear to be caused by the crash, whereas it was purportedly evident that Kingsland's injuries were incurred during the accident with Officer De Armas.

It is clear that the defendant in *Qian* made a good faith effort to discover information that would help clarify the situation he was presented with. On the contrary, a reasonable jury could find that the appellees' investigation was deficient in that the officers consciously did not make an effort to uncover reasonably discoverable, material information. Given that a probable cause

19

determination is based on the totality of the circumstances, the conditions surrounding and leading up to an arrestee's outward manifestations, and not those manifestations alone, factor into the determination. Thus, an officer may not exclusively rely on the outward signs that an individual is exhibiting, without considering them in the context of their surrounding circumstances. *See Rankin*, 133 F.3d at 1435 (stating that probable cause is examined under the totality of circumstances); *cf. Dorman v. Florida*, 492 So. 2d 1160, 1162 (Fla. 1986) (finding no probable cause to administer a blood alcohol test where officer knew the defendant had been involved in a collision, observed that the defendant's eyes were red and watery and that the defendant had been crying, and did not smell alcohol on defendant's breath).

We do not dispute that, in certain situations, an officer may have probable cause to arrest a person if the person was dizzy, performed poorly on field sobriety tests, and exhibited bloodshot eyes and slurred speech. However, the presence of these characteristics cannot be viewed in the absolute. For example, if an officer has no reason to believe that the individual has suffered any trauma to cause these conditions, then a finding of probable cause for DUI would not be dubious. *See generally Qian*, 168 F.3d 949. In contrast, if the investigating officers are fully aware that the person who exhibits such characteristics has, just moments before,

been involved in a forceful automobile collision and has been crying, the presence or absence of probable cause is more ambiguous. Here, the officers found Kingsland sitting in a pile of debris from the collision, and Kingsland allegedly outright told them that she has suffered injuries, including head trauma. In fact, Officer Valenzuela conceded that her behavior was consistent with that of an accident victim. [D.E. 25-1 at 13].

The parties dispute the conduct of the defendants leading up to Kingsland's arrest. Under Kingsland's version of the events, the defendants did not act in an objectively reasonable manner under the totality of the circumstances. It was within the officers' knowledge that Kingsland was involved in an accident, was crying, and faulted Officer De Armas. It may also have been within the officers' knowledge that there were no drugs in Kingsland's truck and that Kingsland had been injured. Yet, there is evidence here that they chose to either ignore or misrepresent those facts, thus making the information on which they based their arrest less than "reasonably trustworthy."[11]

---

[11] We recall that probable cause requires that "'the facts and circumstances *within the officer's knowledge*, of which he or she has *reasonably trustworthy information*, would cause a *prudent* person to believe, *under the circumstances shown*, that the suspect has committed, is committing, or is about to commit an offense.'" *Rankin*, 133 F.3d at 1435 (citation omitted) (emphasis added).

Because we find that there are genuine issues of material fact as to whether the defendants (1) manufactured probable cause, and (2) failed to conduct a reasonable investigation, viewing the evidence in the light most favorable to the plaintiff, we cannot conclude as a matter of law that probable cause existed to arrest Kingsland.[12]  Thus, summary judgment is inappropriate on the merits of the false arrest claim.

## B. *Malicious Prosecution*

Plaintiff Kingsland also asserts a § 1983 claim for malicious prosecution based on the defendants' alleged fabrication of evidence against her, their alleged failure to consider potentially exculpatory information, and their alleged refusal to investigate impartially.  Kingsland maintains that, due to the officers' improper actions, the prosecutor was presented with false and misleading information.  She avers that criminal prosecution was a natural consequence of the defendants' purportedly deceptive account of the accident and its surrounding circumstances.

---

[12] Nor can we conclude, as a matter of law, that probable cause existed on the basis of the unchallenged evidence.  Even if Kingsland failed multiple sobriety tests, was dizzy, and had bloodshot eyes and slurred speech, we cannot say that *under the circumstances presented here*, such evidence is reasonably trustworthy or sufficient to legally establish probable cause for a DUI arrest.  As we have mentioned, Kingsland's physical condition cannot be viewed in a box.  Aside from the odor of cannabis, all of the officers' alleged observations are characteristic of a crying accident victim who claims injury.  Under the requisite "totality of the circumstances" approach, a reasonable jury could find that the defendants did not have probable cause to believe that Kingsland was intoxicated.

22

To establish a federal malicious prosecution claim under § 1983, a plaintiff must prove (1) the elements of the common law tort of malicious prosecution, and (2) a violation of her Fourth Amendment right to be free from unreasonable seizures. *Wood v. Kesler*, 323 F.3d 872, 881 (11th Cir. 2003), *cert. denied*, 124 S. Ct. 298 (2003).

*1. The Common Law Elements of Malicious Prosecution*

Under Florida law, a plaintiff must establish each of six elements to support a claim of malicious prosecution: (1) an original judicial proceeding against the present plaintiff was commenced or continued; (2) the present defendant was the legal cause of the original proceeding; (3) the termination of the original proceeding constituted a bona fide termination of that proceeding in favor of the present plaintiff; (4) there was an absence of probable cause for the original proceeding; (5) there was malice on the part of the present defendant; and (6) the plaintiff suffered damages as a result of the original proceeding. *Durkin v. Davis,* 814 So. 2d 1246, 1248 (Fla. Dist. Ct. App. 2002) (citing *Burns v. GCC Beverages, Inc.*, 502 So. 2d 1217 (Fla. 1986)). Only the fourth and fifth elements are at issue here: whether there was an absence of probable cause for the original criminal proceeding, and whether there was malice on the part of the defendants.

23

"It is well settled that in an action to recover damages for malicious prosecution where, as here, the evidence is in dispute, the existence or non-existence of malice and want of probable cause are questions of fact for the jury." *Good Holding Co. v. Boswell*, 173 F.2d 395, 399 (5th Cir. 1949).[13] Consequently, because Kingsland challenges the legitimacy of the relevant evidence, concerns regarding the fulfillment of the fourth and fifth elements for the common law tort of malicious prosecution are rightly reserved for the jury.

*2. Fourth Amendment Seizure*

Next, Kingsland bears the burden of proving that she was seized in relation to the prosecution, in violation of her constitutional rights. In the case of a warrantless arrest, the judicial proceeding does not begin until the party is arraigned or indicted. *See, e.g., Mejia v. City of New York*, 119 F. Supp. 2d 232, 254 (E.D.N.Y. 2000) ("[T]he existence, or lack, of probable cause is measured as of the time the judicial proceeding is commenced (e.g., the time of the arraignment), not the time of the preceding warrantless arrest."). Thus, a plaintiff's arrest cannot serve as the predicate deprivation of liberty because it occurred prior to the time of arraignment, and was "not one that arose from

---

[13] In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 12, 1981.

24

malicious prosecution as opposed to false arrest." *Id*. at 254 n.26. However, in

having to (1) pay a $1,000 bond; (2) appear at her arraignment; and (3) make two

trips from New Jersey to Florida to defend herself in court, pursuant to the

authority of the state, Kingsland was subjected to a "continuing seizure" for

Fourth Amendment purposes.[14] *See Albright v. Oliver*, 510 U.S. 266, 276-79

(1994) (plurality opinion) (Ginsburg, J., concurring) (stating that a malicious

prosecution claim could be found under the Fourth Amendment in that a defendant

remains seized for trial so long as he is obligated to appear in court and answer the

state's charges); *Gallo v. City of Philadelphia*, 161 F.3d 217, 222 (3d Cir. 1998)

(finding seizure where plaintiff (1) had to post $10,000 bond; (2) was required to

attend all court hearings, including his trial and arraignment; (3) was obligated to

contact pretrial services weekly; and (4) was prohibited from traveling outside

New Jersey and Pennsylvania); *see also Whiting v. Traylor*, 85 F.3d 581, 584

(11th Cir. 1996) (describing malicious prosecution as "the kind of claim where the

plaintiff, as part of the commencement of a criminal proceeding, has been

---

[14] Rather than to vitiate a finding of seizure, discrepancies in the degree or severity of a seizure would presumably be reflected in the amount of damages awarded.

unlawfully and forcibly restrained in violation of the Fourth Amendment and injuries, due to that seizure, follow as the prosecution goes ahead").[15]

Consequently, Kingsland may have a cognizable claim for malicious prosecution, and she has supported her contentions adequately to survive a motion for summary judgment on the merits.

## C. Qualified Immunity

### 1. General Principles

If the defendant officers are entitled to qualified immunity, we must affirm summary judgment in their favor. "Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a

---

[15] In *Whiting*, the plaintiff had been released on bond after being detained for one night, but he had to return to court on twenty occasions to answer the charges against him. *See Whiting*, 85 F.3d at 583. We declined to rule on the "continuing seizure" argument in *Whiting*, holding that two other possible seizures – Whiting's arrest and his surrender after he learned of a newly-issued warrant – "were seizures that could be the basis of a section 1983 claim." *Id.* at 584-85. We later noted that Whiting's arrest was pursuant to the filing of an information and was therefore part of a prosecution. *Id.* at 585 n.7. Furthermore, the warrant issued against Whiting was based on a preexisting charge of obstructing officers, and since it was an initial step of a criminal prosecution, it likewise fell under the tort of malicious prosecution rather than false arrest. *Id.* at 583, 585. In contrast, Kingsland's arrest may not constitute a seizure for purposes of a malicious prosecution claim because it was made before the commencement of a criminal proceeding. *See id.* at 585 n.5. Rather, her being subject to a bond and being required to appear in court to answer the charges against her throughout the prosecution constitute a seizure for purposes of malicious prosecution. Such seizure is virtually no different or less severe than the degree of state control upon which *Whiting* is based – namely an arrest and a surrender. Both here and in *Whiting*, the plaintiff was required to submit to the authority of the state pursuant to legal process. *See id.* at 585.

26

reasonable person would have known.'" *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity represents a balance between the need for a remedy to protect citizens' rights and the need for government officials to perform their duties without the fear of constant, baseless litigation. *GJR Inv., Inc. v. County of Escambia*, 132 F.3d 1359, 1366 (11th Cir. 1998).

The essence of qualified immunity is the public official's objective reasonableness, regardless of his underlying intent or motivation. *See Harlow*, 457 U.S. at 819; *Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002). If reasonable public officials could differ on the lawfulness of the defendants' actions, the defendants are entitled to immunity. *Storck v. City of Coral Springs*, 354 F.3d 1307, 1314 (11th Cir. 2003). However, "[w]here an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action." *Harlow*, 457 U.S. at 819. Qualified immunity "gives ample room for mistaken judgments" but does not protect "the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 343, 341 (1986).

To receive qualified immunity, "the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee*, 284 F.3d at 1194 (citation and internal quotation marks omitted). Here, it is undisputed that Officers Valenzuela and Balikes were acting within the course and scope of their discretionary authority when they arrested Kingsland. "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Id.*

The Supreme Court has held that qualified immunity analysis involves two discrete queries. First, we must decide whether the facts alleged, assuming they are true, demonstrate that the defendants violated a constitutional right. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). If this is answered in the affirmative, we proceed to the second query, which is to determine whether the right violated was clearly established. *See id.* As a result of this analysis, we conclude that Officers Balikes and Valenzuela are not entitled to qualified immunity on either of the false arrest or malicious prosecution claims.

*2. False Arrest*

"Plainly, an arrest without probable cause violates the right to be free from an unreasonable search under the Fourth Amendment." *Durruthy v. Pastor*, 351

28

F.3d 1080, 1088 (11th Cir. 2003) (citing *Redd v. City of Enterprise*, 140 F.3d 1378, 1382 (11th Cir. 1998)). As discussed above, we cannot conclude as a matter of law that probable cause existed to arrest Kingsland. Officers who make an arrest without probable cause are nevertheless entitled to qualified immunity if there was arguable probable cause for the arrest. *Jones v. Cannon*, 174 F.3d 1271, 1283 (11th Cir. 1999). Accordingly, we must inquire whether "reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest Plaintiff. . . ." *Von Stein v. Brescher*, 904 F.2d 572, 579 (11th Cir. 1990). Kingsland must demonstrate that no reasonable officer could have found probable cause under the totality of the circumstances. *See Storck*, 354 F.3d at 1313.

In granting qualified immunity to the defendants, the district court found the facts of this case to be analogous to those set forth in *Post v. City of Fort Lauderdale*, 7 F.3d 1552 (11th Cir. 1993). In *Post*, we granted qualified immunity where government agents inspecting a restaurant made an improper arrest for a building code violation. *Id.* at 1558. The agents in *Post* claimed that they counted people in excess of the restaurant's maximum capacity, but in effect they erroneously counted employees who were not to be counted. We held that a "mistaken but reasonable count" was sufficient for the agents to establish arguable

29

probable cause. *Id.* However, the agents in *Post* simply made a good faith mistake, whereas, here, the officers' conduct creates factual issues as to their credibility. It was error for the district court to omit the plaintiff's allegations of falsification and knowing lack of probable cause from its analysis. It is readily apparent that the conduct in *Post* is characteristic of the type of conduct that the policies of qualified immunity seek to protect. In *Post*, the officials made a reasonable mistake in the legitimate performance of their duties, and there were no concerns regarding potential abuse of authority. *See id.*; *see also Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (officers who reasonably but mistakenly conclude that probable cause existed are entitled to immunity); *Cf. Harlow*, 457 U.S. at 814 ("In situations of abuse of office, an action for damages may offer the only realistic avenue for vindication of constitutional guarantees.").

In contrast, Kingsland contends that the defendants made deliberately false statements to support her arrest, in violation of the law. She cites *Holmes v. Kucynda*, 321 F.3d 1069 (11th Cir. 2003), in which we held that qualified immunity "does not offer protection if an official knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the plaintiff." *Id.* at 1077 (citations and internal quotations omitted). In *Holmes*, we reversed the grant of qualified immunity and

30

summary judgment to police officers where there existed factual questions regarding whether the officers filed a recklessly false application for an arrest warrant. *Id*. at 1083-84. Based on the facts of the case, the panel found that the district court could not conclusively determine that the officer's affidavit was not made in "reckless disregard of the truth." *Id.* at 1084. Likewise, there are questions of fact in this case regarding the integrity of the evidence which is to form the basis of an arguable probable cause determination.

Viewed in the light most favorable to Kingsland, the facts support a conclusion that the arrest affidavit included recklessly or deliberately false statements that are material to a finding of arguable probable cause. If the defendants fabricated or unreasonably disregarded certain pieces of evidence to establish probable cause, as alleged, reasonable officers in the same circumstances and possessing the same knowledge as the defendants could not have believed that probable cause existed to arrest the plaintiff. Because a jury question exists as to whether the defendants constructed evidence upon which to base Kingsland's arrest, the question whether arguable probable cause for the arrest existed is also aptly suited for a jury. Qualified immunity pertaining to the false arrest claim is therefore improper.

3. *Malicious Prosecution*

31

The district court held that the defendants are entitled to qualified immunity on the malicious prosecution claim, stating:

> The next issue is whether Ms. Kingsland's constitutional right to be free from malicious prosecution was clearly established as of November 27, 1995. I agree with Officers Valenzuela and Balickes [sic] that such a right was not recognized by the Eleventh Circuit until it decided *Whiting* [in 1996].

*Kingsland*, No. 99-03393-CV-AJ, slip op. at 14. Alternatively, the district court stated that even if the constitutional tort of malicious prosecution had been recognized prior to Kingsland's arrest, by *Kelly v. Curtis*, 21 F.3d 1544 (11th Cir. 1994), the officers were entitled to qualified immunity because there is no evidence suggesting that they delayed or withheld exculpatory drug test results or insisted upon continuing the prosecution in the face of those results. *Kingsland*, No. 99-03393-CV-AJ, slip op. at 14-15. We conclude that the district court's analysis on this issue is inaccurate. Specifically, the district court misapplied the test set forth in *Saucier*. It failed to clearly delineate the precise constitutional right allegedly violated – here, the Fourth Amendment right against unreasonable seizures in connection with a prosecution. Further, it misapplied the "clearly established" requirement.[16]

---

[16] The explanation that follows will clarify that the officers did not require fair notice that their conduct constituted a thing called "malicious prosecution," in violation of § 1983. *See Kingsland*, No. 99-03393-CV-AJ, slip op. at 14. Rather, they required fair notice that their

As an initial matter, we must clarify the legal principles we are obliged to follow in malicious prosecution cases under § 1983. In any § 1983 action, including an action for malicious prosecution, a plaintiff must "identify the specific *constitutional* right allegedly infringed." *Albright*, 510 U.S. at 271 (emphasis added). In *Whiting*, we suggested that "an independent, classic Fourth Amendment violation is critical to a section 1983 claim called malicious prosecution." *Whiting*, 85 F.3d at 584 n.4. Thus, in § 1983 claims for malicious prosecution, the constitutional right at issue is not the "right to be free from malicious prosecution," but rather the underlying Fourth Amendment right against unreasonable seizures. *See id.* ("[W]e think referring to a federal 'right' to be free from malicious prosecution is actually a description of the right to be free from an unlawful seizure which is part of a prosecution."). Accordingly, we must inquire whether the facts alleged demonstrate that the defendants violated Kingsland's right to be free from an unlawful seizure, and if so, whether the officers' specific violation of the right was clearly established at the time of Kingsland's arrest. *See Saucier*, 533 U.S. at 201; *see generally Hope v. Pelzer*, 536 U.S. 730 (2002).

conduct constituted *a Fourth Amendment violation* – one which rendered them in some way accountable for the continuation of the prosecution.

To the extent that the district court based its judgment on the fact that the "right to be free from malicious prosecution" was not clearly established in 1995, that decision was in error. The district court applied the "clearly established" requirement in an improper context. As mentioned above, a § 1983 claim for malicious prosecution is merely a means by which a plaintiff may seek redress for a violation of his or her clearly established Fourth Amendment rights. We have held that "[l]abeling . . . a section 1983 claim as one for a 'malicious prosecution' can be a shorthand way of describing a kind of legitimate section 1983 claim; the kind of claim where the plaintiff . . . has been unlawfully and forcibly restrained in violation of the Fourth Amendment and injuries, due to that seizure, follow as the prosecution goes ahead." *Whiting*, 85 F.3d at 584. Our focus in a malicious prosecution action must remain on the allegedly unconstitutional conduct of the defendants, not on the label attached to the proceedings. Kingsland "can avoid an order of dismissal if [she] based [her] claim – whatever [she] calls it – on some actual unlawful, forcible, restraint of [her] person." *Id*. Any reference to the need for an independent "right against malicious prosecution" simply directs attention away from the fundamental constitutional inquiry at hand.

While it is true that the courts have not historically adopted a consistent position on the constitutional source of a malicious prosecution claim,[17] the fact that such a claim originates from the Fourth Amendment is not the purpose of the "clearly established" requirement. Only the constitutional right violated, upon which the malicious prosecution claim is based – wherever derived – must be clearly established. The "right" against malicious prosecution is not itself a *constitutional* right. "[A] section 1983 plaintiff must always base his claim on the violation of a specific federal right. Where the right said to be violated is the Fourth Amendment, the plaintiff must establish a concrete violation of that right." *Id.* at 586. For example, in *Graham v. Connor*, 490 U.S. 386 (1989), the Supreme Court addressed the constitutional roots of a § 1983 excessive force claim. The Court stated that, in addressing such a claim, "analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of

---

[17] In *Strength v. Hubert*, 854 F.2d 421 (11th Cir. 1988) (per curiam), *overruled in part by Whiting*, 85 F.3d at 584, we relied on a Fourteenth Amendment substantive due process theory to support the concept of a "federally guaranteed right to be free from malicious prosecution." *See id.* at 426; *see also Whiting*, 85 F.3d at 584 n.4. In 1994, the Supreme Court concluded that the substantive due process component of the Fourteenth Amendment did not provide the constitutional source of a right to be free from malicious prosecution, but the Court left open the possibility that the Fourth Amendment is the appropriate source of such a right. *See Albright v. Oliver*, 510 U.S. 266, 274-75 (1994) (plurality opinion), 510 U.S. at 274-75; *Wood*, 323 F.3d at 882 n.14. Finally, in *Whiting*, we held that the "right" to be free from malicious prosecution is actually an expression of the Fourth Amendment right to be free from an unlawful seizure attributable to a prosecution. *See Whiting*, 85 F.3d at 584 & n.4.

35

force." *Id.* at 394.  Thus, the Court declined to recognize any abstract

constitutional right against excessive force, but rather explained that a separate,

specific constitutional right must be identified on which to base a § 1983

excessive force claim:

> Indeed, many courts have seemed to assume, as did the courts below
> in this case, that there is a generic "right" to be free from excessive
> force, grounded not in any particular constitutional provision but
> rather in "basic principles of § 1983 jurisprudence."
> We reject this notion that all excessive force claims brought
> under § 1983 are governed by a single generic standard.

*Id*. at 393 (footnotes omitted) (rejecting substantive due process as a basis for

excessive force claims because such claims implicate a more specific

constitutional right – the Fourth Amendment).  Likewise, we find that there is no

generic "right against malicious prosecution."  Instead, the plaintiff must

demonstrate a concrete violation of the Fourth Amendment that was clearly

established in November 1995.

Finally, we note that it would be inconsistent with our precedent to adopt

the defendants' position that (1) a right to be free from malicious prosecution must

be clearly established before a plaintiff may maintain a § 1983 claim to that end,

and (2) such a right was not clearly established until *Whiting* was decided in 1996.

If we were to so hold, the validity of our precedential opinion in *Kelly* would necessarily be undermined. In *Kelly*, we held that a detective who obtained a warrant on the basis of false information was not entitled to qualified immunity from liability for malicious prosecution. *Kelly*, 21 F.3d at 1555. In order for the *Kelly* court to have reached such a conclusion, it follows that it must have implicitly recognized the viability of a § 1983 claim for malicious prosecution in 1994, the year *Kelly* was decided. If a malicious prosecution claim based on a violation of the Fourth Amendment was cognizable at least as of 1994, then it is incontrovertible that either (1) the right to be free from malicious prosecution need not be clearly established at all, or (2) such right was indeed clearly established in 1995, at the time of Kingsland's alleged injuries.[18] Any other result would run afoul of our judgment in *Kelly*. Thus, the defendants' assertions cannot be upheld.

_____

[18] Even if we assume that Kingsland's claim may not stand unless a "right to be free from malicious prosecution" was clearly established in 1995, our holding would remain unchanged. It was readily apparent in 1995 that, in the Eleventh Circuit, officers may be sued for malicious prosecution under § 1983. *See, e.g., Nesmith v. Alford*, 318 F.2d 110, 126 (5th Cir. 1963) ("[T]he commencement and prosecution of unfounded criminal prosecution might under certain circumstances constitute, not only malicious prosecution under the state law . . . but a violation of [Federal] Civil Rights as well."); *Strength*, 854 F.2d at 425-26; *Kelly*, 21 F.3d at 1553-55. Given that, in *Kelly*, an officer was denied qualified immunity on a § 1983 claim for malicious prosecution based on the Fourth Amendment, we believe that the defendant officers had sufficient notice that they, too, could be held liable for the tort of malicious prosecution.

Having explained that the fundamental right at issue is Kingsland's right against unreasonable seizure,[19] we now address whether the defendants violated that right, and whether the right was clearly established at the time of Kingsland's arrest.

For a constitutional right to be clearly established, the unlawfulness of an official action must be apparent in the light of pre-existing law. *Hope*, 536 U.S. at 739. The purpose of requiring that a right be clearly established is "to ensure that before they are subjected to suit, officers are on notice that their conduct is unlawful." *Saucier*, 533 U.S. at 206; *see also id*. We have previously described this principle as follows:

> Because fair and clear notice to government officials is the cornerstone of qualified immunity, courts must diligently analyze the preexisting case law to determine whether it really did provide plain notice to every reasonable government official that the *pertinent conduct*, in the *specific circumstances*, would clearly violate preexisting federal law.

*Marsh v. Butler County*, 268 F.3d 1014, 1031 (11th Cir. 2001) (emphasis added). Thus, the central question that we must ask is whether the state of the law in 1995

_____

[19] More specifically, in a § 1983 malicious prosecution case, the right at issue is the right to be free from an unreasonable seizure that is *in connection with a prosecution*, as distinguished from a seizure that is part of an arrest or other proceeding.

gave the officers fair warning that their alleged treatment of Kingsland was unconstitutional. *See Hope*, 536 U.S. at 741.

Falsifying facts to establish probable cause is patently unconstitutional and has been so long before Kingsland's arrest in 1995. *See, e.g., Riley v. City of Montgomery*, 104 F.3d 1247, 1253 (11th Cir. 1997) ("It was well established in 1989 that fabricating incriminating evidence violated constitutional rights."); *see also Hinchman v. Moore*, 312 F.3d 198, 205-06 (6th Cir. 2002) (citing *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989)). So, the defendants were on notice in 1995 that manufacturing probable cause is unconstitutional.

As a final point, we address the defendants' assertion that the prosecutor and the state judge who set Kingsland's bond provided a causal break sufficient to relieve the officers of liability for malicious prosecution. "In many cases, arresting officers will not be responsible for the continuation of the prosecution because the prosecutor (or some other factor) will break the causal link between defendants' conduct and plaintiff's injury." *Whiting*, 85 F.3d at 586 n.10. However, the subsequent acts of a prosecutor or judge do not break the chain of causation in a malicious prosecution case where the prosecutor and judge are acting on allegedly false information provided by the defendant officers. *See Barts v. Joyner*, 865 F.2d 1187, 1195 (11th Cir. 1989) ("The intervening acts of

39

the prosecutor, grand jury, judge and jury . . . each break the chain of causation unless plaintiff can show that these intervening acts were the result of deception or undue pressure by the defendant policemen."); *Cf. Eubanks v. Gerwen*, 40 F.3d 1157, 1161 (11th Cir. 1994) ("[Defendants] did not make the decision as to whether or not to prosecute Eubanks; nor did they act in such a way as improperly to influence the decision by the State Attorney in that regard."). Assuming, as we should, that there was no odor of cannabis in the truck or on Kingsland's person, the defendants' constitutional violations were not discrete, and instead continued through an arrest, an arraignment, and a trial based on false testimony. If the defendant officers fabricated testimony regarding the odor of cannabis and further failed to correct the misinformation provided to the prosecutor, as the plaintiff alleges, they were on notice that their actions clearly violated federal law and are therefore entitled to no immunity.

Qualified immunity is, as the term implies, qualified. It is not absolute. It contemplates instances in which a public official's actions are not protected. *See Madison v. Gerstein*, 440 F.2d 338, 341 (5th Cir. 1971) ("As a law enforcement officer, defendant . . . does not enjoy the cloak of immunity of the quasi-judicial prosecuting attorney."); *see also Butz v. Economou*, 438 U.S. 478, 506-07 (1978) ("[I]t is not unfair to hold liable the official who knows or should know he is

acting outside the law, and that insisting on an awareness of clearly established constitutional limits will not unduly interfere with the exercise of official judgment."). Viewed in the light most favorable to Kingsland, the evidence shows that the arresting officers in this case behaved in an objectively unreasonable fashion and were therefore not entitled to qualified immunity. Given the significance of the disputed issues of fact here, qualified immunity from suit is effectively unavailable, even though after a full trial the officers may yet prevail on the merits.

Accordingly, we reverse the district court's grant of summary judgment on both the false arrest and the malicious prosecution claims, and we remand for proceedings consistent with this opinion.

REVERSED AND REMANDED.